IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | Case No. 1:23-CR-359 (TSC) |
| ) | |
| ) | |
| -v- ) | |
| ) | |
| CAHLYL ROLLINS ) | |

    **Defendant.**

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

  Cahlyl Rollins, by his attorney, Maria N. Jacob, Assistant Federal Public Defender, hereby submits the following memorandum in aid of sentencing in this matter.

  Mr. Rollins was only 22 years old when he committed the instant offense with another individual who was ten years older than him. He is now 24 years old and has been at the Correctional Treatment Facility (CTF) where he has made remarkable efforts towards his rehabilitation in the past two years. Mr. Rollins not only pled guilty and expressed sincere remorse for his conduct but he has also shown his remorse through his extensive programming and efforts to contribute positively to his community upon his release.

  Mr. Rollins' background is heartbreaking. When he was born, his own father denied paternity. His parents did not have the means to provide for him and he grew up in complete poverty, having to bounce around from place to place just to

have a roof over his head and food and water. As such, Mr. Rollins did not have the same opportunities as other kids who had more stability and support as children.

    Mr. Rollins does not deserve the above guideline sentence that the government is requesting. While his conduct was very serious, the mandatory minimum is more than sufficient to accomplish the goals of sentencing when considering his age, his remorse, his rehabilitation and potential for growth, and his challenging upbringing.

**BACKGROUND**

Mr. Rollins entered a guilty plea to four counts of Malicious Use of Explosive Materials in violation of 18 U.S.C. §844(i). Mr. Rollins will be before the Court for sentencing on December 16, 2025. He has reviewed the pre-sentence report and concurs with the calculated guideline range contained therein. Mr. Rollins has been incarcerated since October 31, 2023. He was housed at CTF until earlier this fall where he was randomly transferred to Northern Neck Regional Jail in Warsaw, Virginia.

**ARGUMENT**

I. **Legal Standard**

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing. While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).[1] As the Supreme Court made clear

---

[1] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. §3553(a).

3

in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*, 555 U.S. at 352. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

II. **Imposing a Sentence of Five Years Followed by a Period of Supervised Release is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).**

a. **Mr. Rollins's Personal History and Characteristics**

Mr. Rollins was born in 2000 in Prince George's County, Maryland, and he considers himself a life-long resident of the D.C. area. PSR at pg. 13. He grew up in an unstable family situation with no consistent father figure in his life. His biological father initially denied paternity for four or five years before a paternity test confirmed that Mr. Rollins was his son. Despite this proof of his paternity, his father's side of the family was resistant to accepting him, and this was a rejection that was very hard for Mr. Rollins to grapple with as a young child. He lived with

4

his mother who did her best to provide him with a loving home, but without the financial support of his father and a single-parent income, they lived in poverty, struggling day to day. In the early years of his childhood, Mr. Rollins bounced back and forth between homeless shelters, friends' homes, and relatives' homes until he was around eight years old. Mr. Rollins often lacked food, water, and electricity, and he characterized this early childhood period as "traumatic."

During middle school, Mr. Rollins experienced another drastic change: his mother moved away, and Mr. Rollins, still just a young child, stayed behind because his biological mother could no longer afford to provide for him. He lived with his neighbor, Andrea Pone, who became his custodial guardian and provided him with a supportive, loving home and all his necessities. PSR at pg. 13. He described this shift in care as "night and day." *Id.* Mr. Rollins continues to feel a strong connection with Ms. Pone, whom he regards as his adoptive mother, and he has taken the time he has spent incarcerated to reflect on his actions and how they have impacted those who love him. At the time of his arrest, he was living with Ms. Pone, and he hopes to be welcomed back into her home after his period of incarceration. PSR at pg. 13.

In high school, Mr. Rollins, with his newfound support and stability, did well. He attended Thurgood Marshall Academy Public Charter High School and graduated in 2018. PSR at pg. 15. He was incredibly involved in his school and community. *Id.* The Director of Programs at the Academy wrote a letter to the Court describing Mr. Rollins as a "leader among his peers," and whose time at the school

5

showed his "dedication to the community." *See* Exhibit 1, Letter from Amanda Wilson. Mr. Rollins was also the Student Government Association President for his tenth-grade class, and he graduated with a 3.1 GPA. PSR at pg. 15. Perhaps most notably, even at such a young age, he loved giving back to those around him and living a life of service; he completed 300 hours of community service at Martha's Table in high school. *Id.* Mr. Rollins's former neighbors while he was in high school describe in their letter of support that, "with no model of what a healthy adult life looks like – Cahlyl's resilience and determination to be better than what he knew of life around him was extraordinary." Exhibit 2, Letter from Rob and Jamie Schafer.

      Despite his academic successes and the support of Ms. Pone, he still acutely felt the abandonment by his father and the lack of a father figure in his life. While he has reflected on his childhood as an adult and recognizes some of the hard choices his mother had to make, as a child he was resentful towards his father and his mother. He felt hurt, upset, and abandoned by both of them. As he got older, he sought to reconnect with his father and fill this gap in his life. After graduation from high school, he lived briefly in Florida with his father and sought reconnection with his father and paternal cousins. But instead of healing this broken piece of his childhood, it kindled in him a stronger desire to be accepted amongst his family and he was exposed to an unhealthy lifestyle led by his cousins. He thought to be accepted, he had to fit in with that lifestyle – one full of negative influences, crime, and drug use. This side of the family, he described, was "nefarious" for their activity. It was his cousins who introduced him to opioids on top of the marijuana he

was already using. This compounded his drug addiction and heavily influenced his life.

When he returned to D.C., he found it hard to stay away from this rekindled connection with his father's side and the bad influences it brought, but he tried to find a career that would provide a steady flow of income. He worked for three years at a Valvoline Instant Oil Change in Bowie, Maryland, and became an assistant manager. He then worked at another Valvoline location in Laurel, Maryland, where he earned a higher salary as the service center manager. His most recent employment was at Ourisman Chevrolet in Marlow Heights, Maryland, as the assistant service manager. Mr. Rollins has worked at a variety of other companies for short periods of time since he was 18, and he has always sought to be employed and find the career for him. While Mr. Rollins was always persistent in his desire for employment, he jumped around from jobs almost as often as he did living situations. He lived with a roommate, then his girlfriend, then his brother, then his girlfriend again, and, finally he moved in with his cousin. His cousin is his co-defendant in the instant case.

Throughout this period of instability in employment and living arrangements, Mr. Rollins had been struggling. He has an extensive history of alcohol, marijuana, and prescription opioid use. Mr. Rollins recalls using marijuana for the first time at age 10 and alcohol and prescription opioids at age 18. Since he was 18, Mr. Rollins has struggled with addiction to these substances. Until September of 2023, he had been using alcohol, marijuana, and, whenever he could

7

get them, prescription opioids daily. This drug use clouded his judgment, led him to make, in his words, "extremely stupid" decisions and made him unaware of the severity of what he was doing. Mr. Rollins, while still taking full accountability and responsibility, was "deeply under the influence" during the instant offense and acknowledges how that left him open to being manipulated by others.

The combination of a traumatic childhood, a strong desire to be accepted by the side of the family that abandoned him as a child, and his years-long substance addiction left him vulnerable and susceptible to the wrong influences and led to the "single biggest mistake of [his] life." During his period of incarceration at the D.C. jail, Mr. Rollins has taken every opportunity to redeem himself and set himself up for success after he serves his sentence. In doing so, Mr. Rollins has become a model inmate, a person others can look to, and someone who is determined to be the best possible version of himself. His actions have not gone unnoticed: he has received a flood of letters in support, and they are a testimony to his strong leadership and potential.

Mr. Rollins was part of the Young Men Emerging Unit at the jail, where he has been able to participate and thrive in every program that has been offered, earning a total of 28 certificates for so many different programs that will help him reenter society. *See* Exhibit 3, Certificates. Mr. Rollins once again became a leader among his peers and became a residential mentor to other inmates. *See* Exhibit 4, Mentor Program Welcome Letter. Mr. Rollins also became an inmate worker, doing daily cleaning of the staff work areas, common areas, and restrooms. *See* Exhibit 5,

Inmate Job Description. In doing various activities and programs, Mr. Rollins made such a great impression with so many different people. Kelli Taylor, the co-founder of the Free Minds Book Club, describes to the Court how genuine and meaningful Mr. Rollins's participation was and his goals upon release. *See* Exhibit 6, Letter from Kelli Taylor. It was through this club that Mr. Rollins created beautiful poems, including one called "Oh, Freedom," where he writes:

> Freedom,
>
> I owe you the deepest and most sincere apology there is
> I abused and misused you to the fullest extent
> I took every bit of you for granted
> And never realized your true beauty
> Until you were taken from me
> Now that you are gone
> There isn't one thing I wouldn't sacrifice to meet you again
> If we should be reconnected, I will ensure to cherish you
> And never let you go again

*See* Exhibit 7, Collection of Poems.

Mr. Rollins, in a further attempt to seek meaningful rehabilitation, has taken college courses and was in the middle of his third semester in Georgetown University's Prison Scholars Program before he was transferred to Northern Neck Regional Jail in the fall. *See* Exhibit 8, Letter from Georgetown. Through his college course work, Mr. Rollins earned a 4.0 GPA and a cumulative of 6 credits which are transferable to any higher education institution. Valerie Coats, the program director, explained that his application to the program "stood out among others," and that he has been "highly motivated." *Id.*

9

Throughout his experiences at the jail, several people (including leaders, staff, and other inmates) who interacted with Mr. Rollins came forward to write letters of support for him with the theme of all the letters being his genuine desire for growth and his professional and courteous disposition. *See* Exhibit 9, Letters of Support.

It is also clear from these letters that Mr. Rollins is not just seeking to grow and develop personally, but he truly wants to be there for others, just like his high school self who gave 300 hours to his community. Service is at the heart of everything he does. The selection process for being a residential mentor involved an application, writing sample, and a panel interview. Mr. Colie Levaor Long, Mr. Rollins' mentor in the Georgetown Prison and Justice Initiative, describes Mr. Rollins as a "diamond in the rough" and a "strong, positive role model" with a "blossoming personality." *Id*. at 9. Another residential mentor in the YME Unit described him as a leader who leads by example, shows kindness to everyone, and who takes his own free time to help others on their cleaning detail. *Id*. at 4. During group discussions with the Insight on the Inside program, Scott Provinse, a volunteer teacher with the program, explained how Mr. Rollins encourages others to participate and helps redirect the group when there are disruptions. *Id*. at 11. Mr. Provinse explained that "this kind of quiet leadership is rare and deeply meaningful." *Id.*

Mr. Rollins' extensive participation in these programs, beyond the immense personal growth he is undergoing, will produce tangible sources of support for him

when he is released. The fellowship with the Insight on the Inside program is a part-time paid position with the organization. Free Minds has a Reentry Book Club that provides opportunities for paid apprenticeship experiences, continued skill building workshops, networking opportunities, and Reentry Coaches to support reintegration. Another program Mr. Rollins is a part of, ManPower DC, provides useful information and resources like housing opportunities, career assistance, and education assistance.

Before Mr. Rollins was moved to Northern Neck, he was able to complete a PowerPoint presentation for the Court that compiles photographs of his participation in the various programs he completed. *See* Exhibit 10, PowerPoint Presentation. Below is just one of the photographs taken of the YME unit group.



Mr. Rollins described how the networking benefits from this programming are one of its biggest advantages. With all of his work experience at a variety of

automobile shops and dealers, he started to develop a passion for cars and mechanics, and wants to continue this passion when he is released. His dream is to start and run his own mobile mechanic business. He now knows real entrepreneurs, business people who he can look up to, and mentors who can coach him when he is released. He refers to himself as a "serial entrepreneur," and is he extremely enthusiastic about his entrepreneurial ideas which, thanks to the programming he has immersed himself in, he now knows how to implement. He has notepads filled with business plans, around 40 to 50 of them, each complete with missions, visions, values, and goals. His career goals center around the automotive industry, but for whatever business he decides to create, his main goal is to serve. He wants to carry his passion for community service into his work and his lifestyle because he is insistent that "service is the rent we must pay to occupy the earth."

    Mr. Rollins, when asked about what the biggest goal for him will be when he is released, said that he never wants to be in this position again and that he must rid himself of the people, places, and things that led him to this situation. His nephew, Cahlyl, is eight years old, is his "pride and joy," and the "closest thing [he] has to a son." Mr. Rollins wants to help his nephew be confident, be himself, do positive things with his life, and not make the same mistakes he did. Mr. Rollins wants to achieve all of his goals so that he can help his nephew achieve his. After his release, he also is looking forward to consistently seeing his sister, young Cahlyl's mother, whom he had previously been caring for after she was brutally shot following a domestic incident. Before Mr. Rollins was incarcerated, he was one

of her caretakers, making sure she ate every day, got to all of her appointments, and that her kids got to school. Mr. Rollins said, "she's my heart" and his idol because she is so strong after having been through so much.

There is no doubt that once released, Mr. Rollins will be a productive member of society, an amazing uncle and brother, and the D.C. community will be better with him back in it. His programming has given him college credits at an elite university, the tools and connections he needs to succeed in his business plans, and the mindset to turn away from all of the influences that led him to his current situation.

### b. Nature and Circumstances of the Offense

Mr. Rollins is intensely remorseful for his conduct that he vows never to repeat. Mr. Rollins's remorse is clearly reflected in his early acceptance of responsibility and the subsequent steps he has taken for personal improvement. He acknowledges the severity of his actions in his letter to the Court. *See* Exhibit 11, Letter from Cahlyl Rollins. Notably, Mr. Rollins acknowledges first the negative effects his conduct had on the community. He wrote:

> To my community, I can only imagine the level of fear and panic that I caused on the early morning of July 2nd. I know that my actions that morning not only disturbed the peace, but it also violated the reasonable expectation of security everyone is entitled to in their own neighborhoods.

*Id*. Mr. Rollins also wanted his victims to know how sorry he is and wrote a letter to the Bank of America that undersigned counsel provided to the government to hopefully send to the appropriate person. *See* Exhibit 12, Letter to Bank of

13

America.[2] In his letter, Mr. Rollins genuinely tries to provide solace to his victim that he has reformed himself and is willing to pay restitution to make things right. *Id.*

That night, Mr. Rollins was under the influence of alcohol and drugs. He was not in his right state of mind. The government's theory that Mr. Rollins was a criminal mastermind assisting to "beta" test explosives for future robberies is incorrect. That was not Mr. Rollins's intention and unfortunately, he was dragged into a situation he should not have been in to please his older cousin. Mr. Rollins is not claiming that his criminal behavior was a single aberration – there is no doubt that Mr. Rollins was going down a dangerous path of criminal behavior. However, he was not testing out explosives for future robberies and was not involved in any other robberies. As the government correctly stated, Mr. Rollins did not benefit at all from recklessly detonating explosives at commercial buildings on the early morning of July 2, 2023. It is not a coincidence that the young 22-year-old was sent to actually detonate the explosives while the older cousin remained in the car. That does not mean Mr. Rollins was orchestrating the operation and in fact it means the opposite.

Lastly, Mr. Rollins's young age is a crucial factor in this case that cannot be underscored. The Supreme Court has explained:

> [A] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable

---

[2] Mr. Rollins planned to write similar letters to Truist Bank, Safeway, and the Nike Store, but was transferred to Northern Neck Regional Jail before he had a chance.

14

>among the young…Even the normal 16-year old customarily lacks the maturity of an adult. It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior…[J]uveniles are more vulnerable or suspesctible to negative influences and outside pressures, including peer pressure. This is explained in part by the prevailing circumstances that juveniles have less control, or less experience with control, over their own environment…[T]he character of a juvenile is not as well formed as that of an adult. The personality traits are more transitory, less fixed.

*Roper v. Simmons*, 543 U.S. 661, 570 (2005).

In addition, the Sentencing Commission has previously recognized that "[a]ge (including youth) may be relevant in determining whether a departure is warranted…" §5H1.1 (formerly). The Commission has considered amendments that would significantly discount (or eliminate) the criminal history points that attach to youthful offenses in light of the "[s]cientific studies on brain development showing that psychosocial maturity, which involves impulse control, risk assessment, decision-making, and resistance to peer pressure, is generally not developed until the mid-20s."[3] The recently published 2025 sentencing guidelines eliminated §5H Specific Offender Characteristics but in doing so made clear that "the Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts identified as a basis for a downward

---

[3] U.S. Sentencing Commission, Proposed Amendments 38 (Dec. 26, 2023), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20231221_rf-proposed.pdf; *see also id.* (considering adding language that "A downward departure also may be warranted due to the defendant's youthfulness at the time of the he U.S. Sentencing Commission in its report on Youthful Offenders in the Federal System also defined youthful offenders as those *"age 25 or younger* at the time they are sentenced in the federal system" in light of "recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average." U.S. Sentencing Commission, *Youthful Offenders in the Federal System* 1, 5 (May 2017) (emphasis added).

departure would continue to have authority to rely upon such facts to impose a sentence outside the applicable guideline range as a variance under 18 U.S.C. § 3553(a).[4]" The takeaway from the Commission's findings that were based upon scientific research is that this Court should consider the fact that Mr. Rollins was only 22 years old when he engaged in this conduct and was of course susceptible to so many influences and pressures and his ability to reason was not fully developed. His young age is a crucial factor that should be considered when viewing the nature and circumstances of the offense.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

The recommended sentence will promote respect for the law and provide just deterrence. Firstly, Mr. Rollins's current incarceration of approximately two years has already deterred him from any future misconduct. He has never served any real period of incarceration in his entire life and so this has been a naturally jarring and eye-opening experience. Despite that, he has made the best of his circumstances and vowed to improve himself rather than ever put himself back in a position like this again.

Furthermore, the recommended sentence would not create unwanted sentencing disparities because Mr. Rollins's circumstances are far different than his

---

[4] 2025 Sentencing Guidelines Manual, Chapter 1, Subpart A, also explaining in the Introductory Commentary that "the guidelines and policy statements set forth throughout the Guidelines Manual represent the first step in the sentencing process and are one of multiple factors judges must consider under 18 U.S.C. § 3553(a)." This language acknowledges that non-guideline sentences are a normal part of the sentencing process.

older cousin, Mr. Bragg, who the Court sentenced to 84 months' incarceration. Firstly, Mr. Bragg is much older than Mr. Rollins, being 34 years old at the time of the offense. Secondly, Mr. Bragg did not have the childhood difficulties that Mr. Rollins had and described his childhood rather as "blessed." In addition, while the instant matter was pending, Mr. Bragg was inadvertently released from custody and evaded law enforcement for two months. When law enforcement found him, he was found in a home with seven firearms. Notably, Mr. Bragg also did not engage in the same level of extraordinary rehabilitation that Mr. Rollins did. All these distinguishing factors warrant a sentence far below Mr. Bragg's sentence.

The recommended sentence would also not create a sentencing disparity when comparing it to sentences imposed in past similar cases. For example, in *United States v. Laketia Hazelwood*, 19-cr-208 (RJL), the Court imposed a sentence of 46 months' incarceration after the defendant entered into a 43-unit apartment building and ignited a bag filled with gasoline which ultimately created a fire. The fire department was able to extinguish the fire and while nobody was hurt, multiple residents were displaced for a period of time due to the damage caused by the fire. Ms. Hazelwood was initially charged with 18 U.S.C. § 844(i) but was able to plead guilty to Section 844(d), a lesser offense with no mandatory minimum. Ms. Hazelwood also had a tragic history and was a devoted mother. Similarly, in *United States v. Jerritt Pace*, 20-cr-104 (RC), the defendant was initially charged with 18 U.S.C. § 844(i) but pled guilty to a lesser offense after admitting to filling a plastic laundry detergent bottle with gasoline and lighting it on fire outside of the

17

Metropolitan Police Department. The Court imposed a sentence of 36 months' incarceration partly due to Mr. Pace's past struggles with his mental health.

Lastly, the interests in rehabilitation outweigh a lengthy period of incarceration. Mr. Rollins is still a young man and has an enormous opportunity to change his life for the better. He is motivated and has the momentum of all of his educational and reentry programs to obtain a change when he is released and to change his path permanently for the better. Given this opportunity, Mr. Rollins will not waste it and will spend the remainder of his sentence planning for a successful reentry to the community.

## CONCLUSION

For the reasons stated above, Mr. Rollins respectfully requests that the Court impose a sentence of five years' incarceration with the recommendation that he serve his time at FCI McKean, Allenwood FCI, or FCI Fairton.

Dated:                                           December 9, 2025

                                                 Respectfully submitted,

                                                 A.J. KRAMER
                                                 FEDERAL PUBLIC DEFENDER

                                    By:   s/Maria N.Jacob
                                          Assistant Federal Public Defender
                                          Office of the Federal Public Defender
                                          625 Indiana Avenue, N.W., Suite 550
                                          Washington, D.C. 20004